## THE OHIO AND MISSISSIPPI RAILROAD COMPANY, APPELLANTS *v.* WILLIAM M. KASSON, MARSH W. KASSON, AND JAMES G. DUDLEY, RESPONDENTS.

*Sale and Delivery—Title in Vendor—Bonâ fide Purchaser—Fraud of Vendor.*

A contract to build and deliver railroad cars to Plaintiffs at certain times and places, &c., does not vest the title to such cars in Plaintiffs until such cars are delivered and accepted.

A sale and delivery of such cars to a party purchasing in good faith, before delivery to Plaintiffs, transfer to the vendee a good title.

A subsequent payment for such cars by Plaintiffs, on the fraudulent representations of the maker of the cars as to the completion and delivery of the same according to the terms of the contract, will give them no title as against a bonâ fide purchaser.

THIS was an action to recover possession of four railroad passenger cars, Nos. 27, 28, 31, 32, from the Defendants, Kasson, Son & Co.

It was tried at the New York Circuit, and a verdict rendered for the Plaintiffs, and the value of the cars taken by the Plaintiffs from the Defendants' possession was assessed at $10,000.

The Defendants appealed to the General Term, and in April, 1862, the judgment was reversed, and a new trial ordered.

The Plaintiffs appealed from such judgment of reversal to this Court, and stipulated that if the order of said General Term should be affirmed, judgment absolute should be rendered against them.

The Plaintiffs were a railroad corporation of the State of Indiana, and having an office in the city of New York.

The Plaintiffs, on the 15th of November, 1856, made a contract with the Buffalo Car Company (of Black Rock, Erie Co., N. Y.), by Daniel J. Townsend, President, by which the Buffalo Car Company was to *build, sell, and deliver to* Plaintiffs, *within eighteen months from January first,* 444 box cars, 200 platform cars, 74 cattle cars, and fifty passenger cars, as follows:

To build them, *on the requisition of the Plaintiffs,* provided

such requisition should not be for more than four passenger cars a month, &c., and, also, that *no deliveries be required under two months from notice of requisition.*

To deliver them *to Plaintiffs' order, at the company's works, after the cars should be inspected and approved by Plaintiffs.*

*To pay the freight from the car company's works to the track of the Buffalo and Erie Railroad, in Buffalo.*

The Plaintiffs agreed to buy the cars, and receive them from the car company, at the times and in the manner above described, and at specified prices.

To *provide an inspector,* on the car company's requisition—at least two weeks' notice to be given of the time when his services would be required.

To pay, *on presentation of his certificate of inspection at the Plaintiffs' office, in the city of New York,* from time to time, 45 per cent. in notes at six months, and 55 per cent. in Plaintiffs' bonds, at *eighty-five cents on the dollar.* Afterwards, and on 17th December, an arrangement was closed between the Plaintiffs and Defendants, by which Defendants were to transport certain rolling-stock from Buffalo to Cincinnati, for the Plaintiffs.

The cars which the Defendants transported for Plaintiffs, under this contract, were received by Defendants at their yard at Buffalo, only.

And the cars were deliverable to the Defendants *at their depot,* or on the Buffalo and Erie Railroad track.

About the 30th May, 1857, Townsend, the President of the car company, applied to Kasson to borrow $5,000. Kasson declined. After some negotiation a *sale* of two cars was proposed and accepted, and concluded, for $4,500.

They went to the works, at Black Rock—saw the two cars, Nos. 25 and 26, in an unfinished state, and the sale was agreed on. Townsend then gave Kasson a bill of sale of the two cars, and Kasson gave him two checks for $750 each, dated 1st June, and two notes for $1,500 each, which were paid.

Kasson went often to Black Rock to superintend the comple-

tion of the cars, and about the middle of June took them and conveyed them to Defendants' yard, at Buffalo.

Townsend afterwards, wanting these two finished cars, proposed to substitute four unfinished cars in their stead. This was agreed to. Townsend and Kasson went to Black Rock and selected four unfinished cars, not lettered; and a bill of sale was made out for the four.

Kasson directed the four cars to be lettered the same as the cars of the Plaintiffs were. On the 13th or 14th of July, Kasson took away cars Nos. 27 and 28, and the other two, Nos. 31 and 32, about 25th July, to their own yard. The trucks, or running part of them, were put on wagons and carried directly by common road, from Black Rock to the Defendants' yard, in Buffalo, and the bodies of the cars, separate from the running gear, were hauled out of the car company's shops and put on trucks on the Central Railroad track, with a servant of Kasson's in charge, to go with them to Rochester, and thence to Kasson's yard, and *Kasson paid freight on them.*

· These four cars continued in Defendants' possession from 13th and 25th July, to the January following, when they were replevied in this action.

On the 22d July Townsend presented to Mr. Gould, the Plaintiffs' treasurer, at New York, an invoice of the date of July 14th, for four passenger and seventeen cattle cars, and one box car, not numbered; and also a receipt of the Central R. R. Co., for passenger cars Nos. 27 and 28; and Gould paid Townsend for the cars so invoiced.

On the 29th July Gould paid Townsend for cars Nos. 31 and 32, *on being presented with the Central Railroad receipt,* and Townsend's invoice.

One Mellen had acted as inspector for a while, under the agreement between Plaintiffs and the car company. While so employed, his instructions were to inspect the cars, to receive them from the Central R. R. Company, see that they were delivered to the Defendants—being approved by him—and his certificate of inspection was sent on to Plaintiffs before payment for the cars.

Mellen was discharged, and the Plaintiffs got into the habit of paying the car company for cars, on the production, merely, of the invoice and the Central Railroad receipts.

The car company failed in August of the same year.

*J. Larocque* for the Appellants.

*Wm. M. Evarts* for the Respondents.

HUNT, J.—In my view of the case, the Plaintiffs made payment to Townsend for the cars Nos. 27, 28, 31, and 32, in their own wrong.

The car company, of which Townsend was the President, contracted with the Plaintiffs to build for them and deliver to them a number of cars for their road, upon terms agreed upon. The cars were to be ready at intervals specified, were to be inspected by an agent of the Plaintiffs, upon notice given by the car company; the inspector was to make a certificate of inspection, and was to see that they were delivered on the track of the Buffalo and Erie R. R. Company, in the city of Buffalo, for the Plaintiffs.

Upon the presentation of this certificate to the Plaintiffs, and not sooner, the car company was entitled to demand payment for the cars. The Plaintiffs for a time held the car company to a strict performance of this contract, and furnished the inspector contemplated by its terms. In relation to the four cars in question, they relaxed their vigilance. They did not require an inspection as to their condition, nor a certificate from the inspector of their delivery, to or for them, on the Buffalo and Erie track.

They paid the purchase price upon presentation of an invoice from the car company, and a certificate from the New York Central Railroad Company, that the cars had been delivered to the Plaintiffs upon their road.

This certificate was carelessly given, and was erroneous. Before that time the cars had been purchased, and paid for, by the Defendants, and had been delivered by the car company to the Defendants, and by them transported to their yard in the city of Buffalo, and were then in their actual possession. No delivery was made to the Central Company for the Plaintiffs. The presenta-

tion of the invoice and the certificate of delivery was fraudulent on the part of Townsend.

Upon this simple state of facts there can scarcely be a pretence of a claim against the Defendants for the price of these four cars. It stands thus : The Defendants had bought of the manufacturer certain railroad cars, which he had a right to sell, had paid for them, received them into and retained them in their actual possession. The manufacturer induces the Plaintiffs to pay him for the same cars, upon the fraudulent representation that he had delivered them to the agent of the Plaintiffs, under the contract for building similar cars. It needs no argument to show that the Plaintiffs must bear the loss.

The Appellants insist that a different result must be reached, for two reasons—first, that the Defendants stood in such confidential relations with the Plaintiffs, that they were not permitted to become the purchasers of these cars ; and secondly, that it was the duty of the Defendants to have informed the Plaintiffs of their purchase of these cars ; that their omission to do so justified the Plaintiffs in making payment to Townsend, and gives a just cause of action against the Defendants. As I understand the charge, the Judge at the Circuit ruled, that there were no such confidential relations existing between Plaintiffs and the Defendants, by reason of the contract mentioned, as would prevent the Defendants from becoming mortgagees or purchasers of the cars in question.

No point in favor of a new trial could, therefore, have been made at the General Term on this branch of the case, nor can the argument there be urged to sustain the judgment of the General Term. The proposition contended for by the Appellants is embodied in the refusal of the Judge to charge the following principle, upon the request of the Defendants, viz. : " That the delivery of the car bodies of 27 and 28, on July 10th, and of 31 and 32, on July 27th, to Kasson, in person, and the charge thenceforth by his man, till they came to and remained in the yard of Kasson, Son & Co., was a complete delivery to the Defendants as against all persons, and if the jury believe these car bodies were so deliv-

ered, the title of the Defendants then became complete, and the Defendants are entitled to a verdict." The Judge charged in the following language: " That if the Defendants knew or had reason to believe that the consequence of their omitting to notify the Plaintiffs of their claim of title would be, that the Plaintiffs would pay the car company for the cars, on the proper evidence of their having been sent to them (the Defendants), and did so omit to give notice to the Plaintiffs, and the Plaintiffs did pay for the cars upon such evidence, without notice of any claim of title by the Defendants, that the Plaintiffs' title cannot be defeated by a title thus attempted to be acquired by the Defendants." If this charge had been accompanied by evidence of fraudulent collusion between the Defendants and Townsend, it would have been well enough. Under the proof as it stood, it was not competent to ask the jury to find upon the question of the bona fides of the bill of sale to the Defendants, and whether they knew, or had reason to believe, that an omission to give notice of their claim would induce the Plaintiffs to pay Townsend for four passenger cars that had never been delivered to them. The only facts in evidence pertinent to this point were, that they had purchased and paid for these four cars, and that the Defendants knew that a contract for building and delivering cars of various kinds, existed between Townsend and the Plaintiffs. If they knew this, they knew also that the Plaintiffs were not bound to pay for the cars until inspected, and a certificate given of delivery; and there is no evidence that they had the slightest reason to suspect that Townsend would present to the Plaintiffs full evidence of delivery, on which to obtain the money. There were not sufficient facts in evidence to justify the submission of these questions to the jury.

Neither am I prepared to acquiesce in the law thus laid down at the Circuit. Briefly, it is this: Townsend sells to Kasson four cars, having a right to sell them. They are delivered to Kasson, and paid for by him in good faith. Subsequently Kasson has reason to believe that Townsend intends to present fraudulent evidence of the delivery of the same cars to the Plaintiffs, and obtain their price from them. Unless Kasson thereupon notifies the Plaintiffs

of his ownership, his title to the cars fails, and the Plaintiffs can reclaim them from his possession.

I am not aware of any principle of law on which this position can be defended. If there was collusion between Townsend and Kasson I can readily perceive why Kasson should respond to the Plaintiffs. So if Kasson did any act to promote or induce the payment by the Plaintiffs for the cars.

So if he had been present at the payment, and, without warning, had seen the Plaintiffs purchase and pay for the cars, he would have been held to have waived his claim in behalf of the purchaser. By the rule under consideration, he merely "had reason to believe" that Townsend would, at a future time, perpetrate a fraud—that Townsend contemplated the commission of a fraud.

If I know that a villain intends to defraud, or in any way to injure my neighbor, it is doubtless my duty as a good citizen, and as a Christian man, to put him on his guard. But there is no rule of law which renders me liable for his loss, in case of my neglect of this duty. It is a moral duty, simply, not recognized by law. Certainly there is no law which requires, upon mere suspicion or belief, that I should thrust myself into the business affairs of my neighbors, and endeavor to transact for them those concerns, and provide for them that wisdom and prudence which they are competent to furnish for themselves. It would be officious intermeddling, simply. The question of negligence on the part of the Defendants did not exist in the case, and was improperly submitted to the jury.

The Plaintiffs further insist that the Defendants must fail on the ground of usury in the transactions between themselves and the car company. The question of usury is a personal one, and cannot be raised by the Plaintiffs in this case. See Belmont Bank of Ohio *v.* Hoge (not reported), and Williams *v.* Burch, decided March term, 1867, where the precise question is disposed of.

Under the stipulation, judgment must be entered for the Defendants. It must, however, be limited to $3,000 and interest, together with the expenses of freight, insurance and storage, with interest upon them.

On the trial the Defendants remitted all claim beyond these sums, and such remission remains of record in the case. The Defendants are at liberty to apply for a writ of inquiry to ascertain their damages, or a reference, or such other proceeding as they may be advised is legal and proper.

All concur, except DAVIES, Ch.J., and FULLERTON and BOCKES, JJ., not voting.